UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

JAMES DAVID McCLAIN,

                Petitioner,

    v.

ROBERT LeGRAND, *et al.*,

                Respondents.

Case No. 3:14-cv-00269-MMD-CLB

FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER

This order addresses procedural default and the merits issues remaining in Petitioner James McClain's petition for habeas corpus under 28 U.S.C. § 2254. The Court held an evidentiary hearing on September 23, 2020 and September 24, 2020 ("the Evidentiary Hearing"). The Court makes the findings presented herein in conditionally granting relief as to Ground 4.

I.     **FINDINGS OF FACT**

1.     Petitioner seeks to set aside his 2012 Nevada state conviction, pursuant to a guilty plea, of two counts of sexual assault of a child under 14 years of age. Petitioner was sentenced at the age of 30 to two consecutive sentences of life with eligibility for parole only after serving 35 years on each such consecutive sentence. Petitioner is thus sentenced essentially to life without parole.

2.     Petitioner is intellectually challenged. He has a long history documenting his intellectual disability as well as extreme impoverishment, dysfunction, and abuse during his childhood that further compromised his development.

A psychological evaluation of Petitioner at age 14 reflected that he exhibited, in the terminology of the time, "mild mental retardation," which was consistent with a prior evaluation. Petitioner exhibited an IQ of 60 and a Global Assessment of Functioning score

of 40, which indicates major impairments in judgment as well as in primary functional domains such as school, employment, and managing finances. The psychologist noted that Petitioner "will likely appear of average intelligence when engaged in conversation." However, Petitioner appeared, *inter alia*, to lack skills for rational problem-solving. The psychologist also cautioned against any assumption that Petitioner's overall intelligence matched Petitioner's ostensible verbal intelligence. The evaluator recommended further neuropsychological testing. (ECF Nos. 123 at 158-59; 124 at 39-41; Joint Ex. No. 23; Petitioner's Ex. No. 17 at 5-6, 12-13.)[1]

Given Petitioner's intellectual disability, Petitioner was enrolled in a special education program in school. Thereafter, Petitioner typically obtained any employment through a program for intellectually challenged adults. He struggled to maintain employment, however, in part due to inappropriate behavior associated with his intellectual disability. Moreover, Petitioner needed prompting and assistance in such basic life activities as going to a job, maintaining a functioning household, and managing his finances. Petitioner thus was not capable of living independently on his own without assistance. He received social security disability based on his mental disability. (ECF Nos. 123 at 160-65, 180-81, 206; 124 at 37, 41; Petitioner's Ex. No. 17 at 4-6, 13-14.)

When a comprehensive neuropsychology evaluation was conducted years later in 2018, in connection with this federal petition and consistent with prior evaluations, Petitioner exhibited what now is termed "mild intellectual disability." Testing reflected a full-scale IQ of 74 during that evaluation. Contemporary diagnostic criteria focus, however, not only on the full-scale IQ score but also on the extent to which specific domains or areas of cognition are impaired. (ECF Nos. 123 at 155-60, 165-68, 175-80, 188; 124 at 39, 41-42; Petitioner's Ex. No. 17 at 2, 15, 18.)

---

[1]The parties submitted a joint exhibit list for the Evidentiary Hearing, and the parties also submitted separate exhibit lists. (ECF Nos. 109, 110 & 112). Accordingly, the Court cites to exhibits from the lists that were admitted at the Evidentiary Hearing as "Joint Ex. No.," "Petitioner's Ex. No.," and "Respondents' Ex. No." as identified at ECF Nos. 109, 110 & 112.

*Inter alia*, vis-à-vis verbal intellect, Petitioner on the one hand demonstrated above average ability, in the 96th percentile, for the basic skills of properly reading and sounding out words. However, critically, Petitioner's reading comprehension instead was below average and in the 10th percentile. Petitioner thus could read apparently well but yet could not understand what he had apparently read capably. These results did not "indicate any form of comprehension." (ECF No. 123 at 168-71; Petitioner's Ex. No. 17 at 8-9, 15, 18.)

Similarly, Petitioner's verbal comprehension, working memory, processing speed, and immediate memory were in the low average range, respectively ranking in the 9th, 13th, 10th, and again 10th percentiles. Petitioner's delayed memory was even more impaired, in the borderline range in the 4th percentile. (ECF No. 123 at 171-73, 178-79; Petitioner's Ex. No. 17 at 9-10, 15, 18.)

Petitioner's intellectual disability and impaired functionality limited his ability to understand legal concepts. He thus required substantially more time, and substantially more assistance, to comprehend an important or complicated decision. Such assistance, to be meaningful, required the use of multiple techniques to assure that Petitioner in fact understood the legal issue and the decision to be made. Such techniques would include having him restate a point back in his own words to rule out that he was parroting back words that he in truth did not understand, especially in light of the sharp contrast between his above average superficial reading ability and lack of reading comprehension. Such techniques further would include having Petitioner explore and discuss alternative scenarios and ramifications, to show that he understood the point. Moreover, the technique of having Petitioner later revisit a point would help determine whether he had retained that information. (ECF Nos. 123 at 171-75, 181-83, 196, 202-03; 124 at 42-44; Petitioner's Ex. No. 17 at 2, 9-10, 15, 18.)

"Yes" or "no" questions directed at a person with Petitioner's degree of intellectual disability as to whether they understood would provide no assurance that they in fact did. It is common for a person with such intellectual disability to respond "yes" to these inquiries to "get along" and/or to not appear disabled. The propensity therefore to simply

1    respond "yes" makes such persons subject to manipulation and exploitation. (ECF Nos.

2    123 at 182-83; 124 at 42-44.)

3         Petitioner's intellectual disability is not a condition that changes over time or can

4    be cured. Petitioner thus has had and will have the level of functioning exhibited during

5    the 2018 evaluation, which is consistent with his prior evaluations and history, throughout

6    his life. (Petitioner's Ex. No. 17 at 6, 15.)

7         3.    Notwithstanding Petitioner's cognitive deficits, Petitioner was competent to

8    stand trial, in that he could sufficiently assist in his defense and otherwise had the

9    requisite minimum mental capacity to satisfy the relevant competency standard. Petitioner

10   further was capable of—ultimately—understanding the key points needed for making a

11   knowing, voluntary, and intelligent plea decision. Given Petitioner's cognitive deficits,

12   however, Petitioner would only be able to reliably, truly, and effectively understand those

13   key points if his counsel took numerous affirmative steps, as outlined above, to ensure

14   he understood before making such a decision. Simply asking Petitioner whether he

15   understood an abstract concept and securing a "yes" answer would not reliably reflect

16   that Petitioner understood a point or his decision. (ECF No. 123 at 185-86, 198-200, 202-

17   03, 206; Petitioner's Ex. No. 17 at 2, 11, 15-16. *See also* ECF No. 124 at 43-44.)[2]

18        4.    Petitioner was arrested on April 23, 2012. He was charged in a criminal

19   complaint filed the next day on April 24, 2012, with seven counts of sexual assault on a

20   child under 14. (Joint Ex. Nos. 1, 2.)

21        5.    Petitioner was charged with one such count for each calendar year from

22   2004 through 2010, and each offense was alleged to have occurred "within" the

23   respective calendar year. (Joint Ex. No. 2.) The sentence for a sexual assault offense

24   was increased by the state legislature and became effective October 1, 2007. Offenses

25   committed before that date carried a life sentence with parole eligibility after 20 years,

26

27        [2]The Court discusses Petitioner's childhood circumstances further *infra* in relation
     to potential mitigation for sentencing. The Court has focused here initially more on
28   Petitioner's specific cognitive deficits in relation to defense counsel's handling of the case
     regarding the plea.

and offenses committed after that date carried a life sentence with parole eligibility after 35 years. *See* NRS § 200.366(3)(c), *as amended by* 2007 Laws, ch. 528, §§ 7 & 17 at 3256 & 3265. If convicted and sentenced consecutively on all seven counts, Petitioner faced an aggregate minimum of 185 to 200 years of incarceration prior to possible consideration for parole. This is dependent upon whether Petitioner was convicted on the 2007 count for alleged conduct before or after October 1, 2007.

6.      On April 25, 2012, the justice court appointed Public Defender Paul Drakulich to represent Petitioner and set a status conference for the next morning. (Joint Ex. No. 3.)

7.      On April 26, 2012, Drakulich advised the justice court that he had a representation conflict. The court reset the status conference for May 3, 2012. (ECF No. 17-1 at 3.) At some point, the court eventually appointed Cheri Emm-Smith[3] as a conflict attorney in Drakulich's stead. (ECF No. 123 at 6-7.)

8.      On May 2, 2012, with Emm-Smith as Petitioner's counsel, Petitioner executed a waiver of a preliminary hearing. Petitioner did so only after, and because, he had agreed to a plea deal with the State of Nevada. Under that plea deal, the then 30-year-old intellectually challenged Petitioner, who was at that time a defendant, was to plead guilty to two counts, each with 35 years to life sentence. The matter of whether the sentences should be imposed consecutively or concurrently was left to the discretion of the judge in the case. (ECF No. 123 at 11-14, 17; Joint Ex. No. 4.)

9.      The record does not reliably establish that Emm-Smith conferred with Petitioner before Petitioner entered into the plea deal substantially more than on one brief occasion.

_____

[3]Emm-Smith now serves as a municipal court judge. This case, however, pertains exclusively to Emm-Smith's role as appointed counsel for Petitioner, prior to and unrelated to Emm-Smith's judicial service. The Court finds no appropriate reason to further refer to the Emm-Smith' current judicial office in discussing what she did and did not do earlier as appointed counsel for Petitioner. Municipal Court Judge Cheri Emm-Smith is thus referenced simply by name in the remainder of this order.

1    Emm-Smith testified to the contrary that she met with Petitioner several times

2    before the plea decision, and that she conferred extensively with Petitioner each alleged

3    time. (*E.g.*, ECF No. 123 at 14, 17-18.) Her testimony appears to be an incorrect *post hoc*

4    reconstructed recollection that the Court cannot find to be credible. Emm-Smith altered

5    her reconstructed recollection and contradicted herself multiple times during her brief

6    testimony, as she was confronted with one piece of contemporaneous evidence after

7    another, that contradicted her immediately preceding testimony.

8    When Emm-Smith was first asked about her knowledge of Petitioner's employment

9    history prior to the May 2, 2012 proceeding, Emm-Smith responded, "I spoke with

10   [Petitioner], oh, five or six times prior to – during the course of my representing him. I

11   would go down to the jail and speak with him." (*Id.* at 9. *See also id.* at 15.) When

12   subsequently asked again as to how many times Emm-Smith met with Petitioner between

13   her appointment as counsel and the May 2, 2012 waiver, Emm-Smith responded, "I don't

14   recall." (*Id.* at 10-11.) Thereafter, when asked again how many times Emm-Smith met

15   with Petitioner between Emm-Smith taking the case and the May 2, 2012 waiver, she

16   responded "about seven or eight" times in what was less than a week period. She

17   unilaterally elaborated and stated the following: "I went down into the jail and met

18   [Petitioner] after work in the evenings so that I could spend time with him. The jail was

19   very accommodating and would let me spend as much time as I needed with [Petitioner].

20   They gave us a room and we, we met in that room. But, I went in numerous times to go

21   talk to [Petitioner]." (*Id.* at 17-18.)

22   Emm-Smith was then confronted with the jailhouse visitation log, which reflected

23   only one visit by her during this period. (*Id.* at 18-19.) The visit occurred on May 2, 2012

24   and lasted nine minutes from 3:23 to 3:32 p.m. (*Id.*) Emm-Smith suggested that it lasted

25   only nine minutes "[b]ecause that would have been right after [she] got [Petitioner's]

26   discovery, and [she] went in and talked to [Petitioner] and told him [she] was representing

27   ///

28   ///

6

him, [] and who [she] was." (*Id.* at 20.)[4] She further suggested that it would have been too burdensome, likely because of the overall entry process, to go in for just nine minutes. (*Id.* at 21.)

More significantly, Emm-Smith substantially changed her story about where and when she met with Petitioner prior to the plea decision reflected in the May 2, 2012 waiver. She testified that she was not surprised by the single visit entry at the jail before this date. She states, "[b]ecause I would have met with [Petitioner] also up there, uh, up up in the Justice Court at the pretrial hearing." Emm-Smith explained that "all of the cases would be set for a pretrial hearing, uh, before the preliminary hearing, so that we would meet with them, sit and meet with them, and talk to them as well." She further elaborated that "as soon as somebody got arrested, then they would set it for [a pretrial conference] the following Thursday, and we would go meet with them and get the discovery[5] and everything else." She would have tried to "fast-track" such a meeting with Petitioner in custody. She then hedged by concluding that "I know I met with him either in the jail or at the pretrial conference." (*Id.* at 20-21. *See also id.* at 53.)

The Court later gave Emm-Smith an opportunity to review the justice court docket sheet. The Court queried when the status conference or pretrial hearing or conference Emm-Smith had referred occurred. As noted in Finding No. 7, *supra*, the docket sheet reflected that on April 26, 2012, Drakulich informed the justice court of his conflict and the court reset the initial status conference for May 3, 2012. Emm-Smith testified that she "may" have met with Petitioner on April 26, 2012 "because Drakulich and I would have

---

[4]The clerk of the justice court file-stamped on May 2, 2012 at 3:53 p.m. the executed waiver form, which was signed *after* agreeing to a plea deal. (Joint Ex. No. 4.) Emm-Smith thus was positing that she had a first, brief introductory meeting with Petitioner at the jail for nine minutes, only a half hour before Petitioner waived a preliminary hearing based on his agreement to a plea deal under which Petitioner very likely could be in prison for the rest of his life. Such variances, incongruities and *non sequiturs* make the credibility of Emm-Smith's testimony problematic.

[5]In this variation of Emm-Smith's account, Emm-Smith posited that she received the discovery and initially met Petitioner at an earlier time than in her previous testimony about the initial meeting occurring at the jail on May 2, 2012. (*See* note 3, *supra*.)

both been at the courthouse on the same day," and she recalled meeting with Petitioner in the conference room. She further testified that she thereafter met with Petitioner "at least three times in the jail prior to the – prior to the uh, waiver, before he accepted the plea." Emm-Smith stated that she did not know why the jail records did not reflect the meetings. (ECF No. 123 at 64-71.)

Emm-Smith's shifting accounts—as to, *inter alia*, the number, location, length, purpose, and procedural context of meetings—given within only a matter of minutes on the stand as she was confronted with contrary contemporaneous evidence are at best an incorrect reconstructed recollection. These accounts are not credible to the Court. Emm-Smith may very well sincerely believe, or want to believe, that she provided constitutionally adequate representation. Her clinging to that belief—and attempting to generate a corresponding recollection as she was confronted with contrary contemporaneous evidence—does not, however, make her testimony on this factual point credible to the Court.

Even more critical, however, is what Emm-Smith indisputably *did not do* with whatever time she did purportedly apply to meeting with Petitioner and to representing him in the case prior to the May 2, 2012 plea decision and to the formal entry of the plea thereafter.

10.   Emm-Smith was aware even from her extremely limited early discussion with Petitioner that he was "low," "lower on the intelligence level," or "slow." She testified that she "would assume" that Petitioner had been in special education classes. Yet, Emm-Smith did not conduct any investigation into Petitioner's mental health, educational, employment, psychosocial, and other history prior to the plea decision or the formal entry of a plea. She did not ask Petitioner about his disability or other pertinent background information when meeting with him. She did at some point become aware that Petitioner had been employed through a special needs program. (*Id.* at 7-10, 13, 24-29.)

11.   Relevant background information that would have formed a basis for further investigation was already in the case record via a court services interview worksheet that

was filed earlier on April 24, 2012. This document disclosed that Petitioner was on disability and previously had been employed through Fallon Industries, a special needs program for adults. Emm-Smith, however, did not look at this document because it was in the suit record rather than in the discovery provided by the State. Relevant information could have also been developed by counsel's cursory investigation even without resorting to the document in the case record. (*Id.* at 27-29; Petitioner's Ex. No. 10.)

12.    Nor did Emm-Smith—despite her lay assessment that Petitioner was "low" or "slow"—seek a professional evaluation of Petitioner's intellectual capability prior to the May 2, 2012 plea decision and the formal entry of a plea, to assess, *inter alia*, limitations and factors affecting his ability to understand the plea decision. (*See, e.g.,* ECF No. 123 at 34.) Instead, Emm-Smith relied upon her purely lay assessment, with no investigation of Petitioner's background, that Petitioner understood. She was "surprised" when she later found out his actual IQ level:

> Because when I spoke with him he was able to carry on a conversation. I would ask him things and he would respond that he understood. If he did not understand, then we had conversations about what was going on with the plea agreement.

(*Id.* at 53.) Emm-Smith thus did precisely what the evaluating psychologist had cautioned against. She simply assumed Petitioner's overall intelligence matched his ostensible verbal intelligence. (*See supra* Finding No. 2 at p. 1.) She did not caution because she failed to conduct any investigation of Petitioner's background, including his mental health background. (*See also* ECF No. 123 at 104-06.) The psychologist also had recommended neuropsychological testing, a recommendation Emm-Smith also never saw because she never conducted any investigation. She failed to do so despite observing that Petitioner was "slow."

13.    Due both to the limited time Emm-Smith spent with Petitioner and her complete failure to investigate his background, she thus did not employ the multiple techniques needed to assure a person with Petitioner's cognitive impairments in fact understood the consequences of the plea. She did not ask Petitioner to restate points

1   back to her in his own words to rule out that he was just parroting back words he did not

2   actually understand. She did not have him explore and discuss alternative scenarios and

3   ramifications to demonstrate he understood a point. She also did not revisit points again

4   with him later to determine whether he had retained information. Rather, Emm-Smith

5   mainly explained points to Petitioner and then asked him whether he understood,

6   discussing a point further only if he said that he did not. (ECF No. 123 at 14, 15-16, 22-

7   23, 53.) The Court is therefore not persuaded by Emm-Smith's testimony that she did

8   more than that or that she used the multiple modalities outlined above that would assure

9   Petitioner actually did understand. Essentially, Emm-Smith's testimony was that she

10  believed the intellectually challenged Petitioner understood the plea because "I explained

11  it to him." (*See id.* at 59-60.)

12      14.   Emm-Smith's testimony establishes that, from the outset of the plea deal, it

13  was more likely than not that the state district court would impose the two 35-years-to-life

14  sentences consecutively. The presiding judge was a former prosecutor, and Emm-Smith

15  testified that "he was very tough at sentencing" and "he would impose a high penalty." (*Id.*

16  at 35, 51.) Emm-Smith further testified that "the state was very adamant about going for

17  the maximum penalty they could on [Petitioner], so the sentence was pretty much set

18  once that plea was entered," at the very least because of the statutory 35 years to life

19  sentences. (*Id.* at 36.) She asserted that "it would not surprise me that [the judge] would

20  go consecutive on this type of a case." When asked whether the judge would be more

21  likely to impose concurrent time if there were fewer counts (such as pursuant to a plea),

22  Emm-Smith responded: "Um, not necessarily." (*Id.* at 51.)

23      15.   Emm-Smith's testimony further establishes beyond doubt that Petitioner did

24  not understand the most fundamental consequence of the plea decision, that he was

25  going to prison quite likely for life and in all events for no less than 35 years. In their limited

26  time together, Petitioner *repeatedly* asked Emm-Smith whether she thought his girlfriend

27  "would wait for him until he got done with his sentence." Emm-Smith described that as

28  ///

1   "his main concern." (*Id.* at 14-15, 63.) Astoundingly, Emm-Smith concluded her testimony

2   on redirect with the following:

3   > [Petitioner] understood the severity ["of the case against him."] *I don't know*
4   > *if he understood* what he did constituted – how severe what his actions
    > were, *that he truly comprehended that he could go away for, for a – to prison*
5   > *for a long time. I don't think he ever comprehended that.*

6   (*Id.* at 64 (emphasis added).) If Petitioner did not understand that, he clearly did not

7   understand the consequences of the plea. This moment of clarity by Emm-Smith wholly

8   undercuts her earlier conclusory responses asserting he understood. (*E.g., id.* at 62.)

9          16.     Despite the failure of her "slow" client to comprehend the most fundamental

10  consequence of the plea decision, Emm-Smith nonetheless proceeded forward with the

11  May 2, 2012 waiver of the preliminary hearing pursuant to a plea deal and thereafter

12  through to formal entry of a plea.

13         17.     When the matter came on for entry of a plea on May 8, 2012, with Petitioner

14  present, Emm-Smith requested a one-week continuance. She stated that she "spoke with

15  [Petitioner] this morning," and "[h]e's got some issues that we need to discuss before we

16  enter a plea." (ECF No. 17-6 at 3.) On the one hand, this proceeding reflects Emm-Smith

17  requesting more time ostensibly to discuss the plea deal with Petitioner. On the other

18  hand, Emm-Smith's need to request more time when she spoke with Petitioner at the

19  courthouse before he was scheduled to enter a formal plea casts further substantial doubt

20  regarding whether Petitioner understood the plea deal on May 2, 2012, when he waived

21  a preliminary hearing, and thereafter up through May 8, 2012.

22         18.     Emm-Smith's testimony that she met with Petitioner multiple times at the jail

23  between May 2, 2012 and May 15, 2012 is in contrast with the jail visitation log. The log

24  reflects only one meeting at the jail for 23 minutes, which occurred on May 14, 2012. (*Id.*

25  at 21-22.) The Court thus does not find Emm-Smith's testimony that she met with

26  Petitioner for a substantial and sufficient amount of time during this period to be credible.[6]

27  _____

28          [6]The Court will discuss Emm-Smith's testimony reflecting her rationale, regarding
    both the plea deal and specifically the timing of the plea deal, when it applies the
    applicable legal standard for deficient performance in the conclusions of law *infra*. The

19.     Emm-Smith's failure to conduct any meaningful inquiry of Petitioner as to his background, especially his mental health background, and Emm-Smith's failure then to investigate his background, failed to live up to prevailing professional norms in Nevada at the time. (*Id.* at 99-105, 137-40; Petitioner's Ex. No. 15 at 5-7, 8-10.)

20.     Emm-Smith's failure to do so was particularly egregious after she observed her client's lower-level cognitive functioning ability and became aware that he had been in an adult special needs program.

21.     Emm-Smith's failure to assess prior to the plea whether a professional evaluation was needed, and her failure to timely alert the court of Petitioner's cognitive issues, fell below prevailing professional norms in Nevada at the time. Whether Petitioner may have been competent to proceed under the relevant legal standard was beside the point, as was the prospect that a competency evaluation *per se* was not necessarily required. The pertinent inquiry for professional evaluation instead went to the extent to which Petitioner's impairments compromised his ability to understand the plea decision. Based upon what Emm-Smith already knew, notwithstanding her failure to inquire and investigate, the prevailing professional norms required her "at that point to inquire further, seek school, social service and psychological testing records and assess whether current testing should be performed." (Petitioner's Ex. No. 15 at 6.) Her failure to conduct that inquiry fell below the prevailing professional norms in Nevada, in part because it prevented a timely assessment which could have alerted the court to the issue or prompted further evaluation (as was recommended in Petitioner's prior mental health records). (ECF No. 123 at 114-15; Petitioner's Ex. No. 15 at 5-7, 9-10.)

---

salient point is that her stated rationale, on its face, provided no basis to: (a) fail to inquire and investigate and then take adequate steps to reliably assure the intellectually challenged defendant understood the consequences of the plea; and (b) proceed forward with the plea deal and then formal entry of a plea when it was abundantly clear to counsel at the time that Petitioner did not understand the most fundamental consequence of the plea. There is no reasonable strategic decision in this context that overrides the fundamental, baseline requirement that the plea must be knowing, voluntary, and intelligent. Emm-Smith nevertheless proceeded with disregard for this fundamental requirement.

22.    Emm-Smith's failure to seek such evaluation of her client was even more egregious given that she conceded that she did not "think he ever comprehended" that he was going to prison for a long time under the plea deal.

23.    Emm-Smith's failure to take the time needed to adequately explain the plea decision to her client fell below then prevailing professional norms in Nevada. (ECF No. 123 at 107-10, 112-14, 135-40; Petitioner's Ex. No. 15 at 5-7, 9-10.)

24.    Emm-Smith's failure to employ multiple additional modalities of explanation needed to reliably assure that her client understood the plea and its consequences fell below then prevailing professional norms in Nevada. (ECF No. 123 at 105-07, 112-14; Petitioner's Ex. No. 15 at 6, 9-10.)

25.    Emm-Smith thereafter proceeded to have her intellectually challenged client move forward with a waiver of the preliminary hearing pursuant to a plea deal, and then with formal entry of a plea without reliably determining that her client understood the fundamental consequences of the plea, fell below then prevailing professional norms in Nevada. (ECF No. 123 at 107-15, 135-40, 143-49; Petitioner's Ex. No. 15 at 5-7, 9-10.)

26.    In all of these respects, both singly and in combination, Emm-Smith's representation fell below then prevailing professional norms in the Nevada legal community up to and through entry of a plea.

27.    On May 15, 2012, Petitioner formally entered a guilty plea. When the judge in Petitioner's case asked Petitioner during the colloquy whether he understood what running consecutively meant, he responded "[n]ot exactly." The judge explained the difference and then asked Petitioner: "Do you understand that?" Petitioner responded, "Yes, Sir." (ECF No. 17-8 at 4-5.) Given the prior findings herein, Petitioner's affirmative response to this query and other queries during the colloquy did not reliably reflect that Petitioner did in fact understand the plea decision and its consequences.

28.    Considering the foregoing factual findings and the testimony presented, the Court finds that there was a reasonable probability that, at the time of the plea, Petitioner did not understand the plea decision and the consequences of the plea. The Court finds

the expert opinion evidence of Dr. Brian Leany, Ph.D., more persuasive on this point than that of Dr. Melissa Piasecki, M.D., to the contrary. (ECF No. 123 at 183-206; Petitioner's Ex. No. 17 at 11-12, 15-16.) Emm-Smith's testimony clearly acknowledges Petitioner did not understand that he was going to prison "for a long time," much less likely for life. The *indicia* relied upon by Dr. Piasecki, including Petitioner's statements to her in 2020, do not lead the Court to a different finding. (*See* ECF No. 124 at 23-27, 34-44.) Moreover, Dr. Piasecki's written report failed to even reference, much less explicitly address, the contemporaneous guilty plea transcript. (*Id.* at 44-46; Respondents' Ex. No. 12.)

29.     Following the entry of the plea, Petitioner's sentencing was set for July 3, 2012. Petitioner's counsel, Emm-Smith, was not present when Petitioner was interviewed on June 14, 2012 by the parole and probation division for the presentence investigation report ("PSI"). (ECF No. 19 at 6 (sealed).)

30.     When Emm-Smith received the PSI two to three days before the July 3, 2012 sentencing, she learned—for the first time—that Petitioner had been diagnosed as "mildly mentally retarded" and among other things, Petitioner had been in special education classes during his school years. (ECF No. 123 at 24-26, 29, 34-35.)

31.     Petitioner's handwritten statement submitted with the PSI further reinforces the conclusion that Petitioner entered a plea that he did not understand. In the statement, Petitioner extensively begged and pleaded for probation, which was not possible under the plea deal. (*See* ECF No. 19 at 9-10.) Respondents suggest that Petitioner made this impassioned plea for probation only because preprinted boilerplate language in the statement form's preamble generically directed a defendant, among numerous topics, to explain "why you may be suitable for probation." Respondents urge that Petitioner's begging for probation thus was merely a "logical response" to the query in the preamble rather than an indication that he did not understand the guilty plea. (ECF Nos. 116 at 12; 123 at 192; 128 at 8, 15.) The Court is not persuaded by Respondents' suggestion that Petitioner was merely making a finely nuanced logical response to instructions on a form that he fully understood and responded to, despite probation being unavailable, all in a

14

situation where his counsel was wholly absent. Rather, Petitioner's response further supports the Court's conclusion that there was a reasonable probability that Petitioner did not understand the consequences of the guilty plea at the time of the plea and thereafter, with Petitioner pleading with the court in the statement for an option Petitioner still erroneously believed was possible in his case. (*See* ECF No. 123 at 192.)

32.     Emm-Smith did not have any follow up conversations with Petitioner to assess his level of comprehension of the proceedings after she received and reviewed the PSI. She did not prepare and file any motions prior to sentencing to seek a continuance to have Petitioner evaluated by a mental health professional to assess his level of comprehension of the proceedings. She did not consider filing a motion to withdraw the guilty plea. (ECF No. 123 at 29, 31, 34-35.)

33.     When Petitioner spoke toward the end of the July 3, 2012 sentencing, he still did not appear to fully understand what was happening and that he was going to prison, most likely for the rest of his life after the plea. He referred, *inter alia*, to trying to reach a particular worker with the state who had helped him in the past. Petitioner stated that he was trying "to see about getting back into like a contract with them, because I did have a contract with them before to be able to communicate with them and have them help me as well with everything." Petitioner did however state that he had "not been able to get – I have not been able to get a hold of them yet to be able to confirm what's going on." He echoed the request that had been made by his counsel immediately before he spoke that he "be able to get concurrent rather than consecutive." And he requested to "be able to get an evaluation . . . a mental evaluation." (ECF No. 17-10 at 10-12.)

34.     The judge then stated on the record that during a bench conference before the sentencing that Petitioner's counsel "mentioned that she would ask for a mental evaluation." Yet, Emm-Smith put nothing on the record about any such request after the bench conference. Nor did she make any further record about such a request after the judge referenced the bench conference. Emm-Smith in particular did not make any request on the record for a mental evaluation specifically to assess the extent to which

Petitioner's cognitive impairments called into question whether he had entered a knowing, voluntary, and intelligent plea. During Emm-Smith's on-record remarks earlier regarding sentencing, she stated that "[Petitioner] is barely functional according to the P.S.I. . . . [and] I question whether that's a high estimate." Emm-Smith made no on-record request for a mental evaluation, and she made no connection to the need for such an evaluation to assess whether Petitioner had understood the plea entered. At the Evidentiary Hearing, Emm-Smith conceded that she had no explanation for her failure to make a record in this regard. (ECF Nos. 17-10 at 10; 123 at 71-73.)

35.     Emm-Smith's representation between the plea and sentencing regarding the continuing serious issue as to whether the plea had been knowing, voluntary, and intelligent, fell below then prevailing professional norms in Nevada. This includes, singly and in combination: (a) her failure to conduct further investigation after she finally learned of Petitioner's relevant mental health history from the PSI, following her earlier failure to do any background investigations; (b) her failure to timely and reasonably file written presentence motions for a continuance, for a mental health evaluation, and to withdraw the plea; (c) her failure at the sentencing to request a mental health evaluation specifically to assess the impact of Petitioner's cognitive impairments upon his understanding of the rapid plea decision; and (d) her failure to make a sufficient record at the sentencing of the request for a mental health evaluation and the reasons why an evaluation was needed. (*See* ECF No. 123 at 114-15; Petitioner's Ex. No. 15 at 6-7, 9-10.)

36.     Considering the foregoing factual findings and testimony presented, the Court finds there was a reasonable probability that properly supported written motions to continue the sentencing, for a mental health evaluation, and to withdraw the plea would have been successful if seasonably pursued by competent counsel. Respondents posit that the gist of the underlying support for such requests for relief already was present in the PSI and that the factual assertions did not persuade the court then to order even an evaluation. (ECF Nos. 116 at 15; 128 at 10-11.) This suggestion, however, equates mere statements made by an intellectually challenged defendant without corroboration and

16

elaboration by supporting medical records with a properly supported presentation made by competent counsel after conducting an adequate investigation. There is no such equivalence.

37.    Emm-Smith meanwhile made no substantial effort after the plea and through the sentencing to develop and present mitigating evidence to try and persuade the court that the sentences should be imposed concurrently. Due to her initial and continuing failure to conduct a competent background investigation, Emm-Smith learned for the first time from the PSI shortly before sentencing that, *inter alia*: (a) Petitioner had been diagnosed as being "mildly mentally retarded"; (b) Petitioner was on social security disability as a result; (c) Petitioner had himself been sexually molested as a child multiple times by his uncle; and (d) Petitioner had grown up in extreme poverty to the point of his family having to eat from dumpsters and having no power in their home. All such points were presented to the court solely via Petitioner's word as reported in the PSI, with no corroboration and no elaboration from health care professional records with testimony as to the impact of Petitioner's cognitive impairments and extremely impoverished youth. Emm-Smith never sought to investigate, develop, and present such evidence at any time in the case, including sentencing. (ECF Nos. 19 at 3-4, 7; 123 at 24-27, 29, 34-35, 40-41.)

38.    The only witness that Emm-Smith called for Petitioner's sentencing did substantial harm and produced no benefit to Petitioner. Emm-Smith spoke with Petitioner's father on the morning of the 9:00 a.m. sentencing. She testified that she thought from that conversation with Petitioner's father, which she had only a few minutes before the sentencing, that he would speak about Petitioner's hard childhood. Instead, Petitioner's father blamed child protective services for leaving the child victim in Petitioner's home, which was not helpful. Emm-Smith never sought to elicit any testimony about Petitioner's childhood from Petitioner's father after putting him on the stand. (ECF Nos. 17-8 at 9; 123 at 36-37, 56, 62; 17-10 at 8-9.)

///

17

39.     In contrast to the mitigation evidence that could have been developed, presented, and argued with an adequate and timely background investigation, Emm-Smith's remarks to the sentencing court were extremely brief. She referred to the report in the PSI that Petitioner had a tough childhood, including having to eat from dumpsters, and that Petitioner was "barely functional according to the P.S.I." The report of course was a report of assertions made only by Petitioner himself. Consistent with the fact that Emm-Smith did not say much at all, despite her client facing a potential *de facto* life without sentence, she remarked: "There is not a whole lot we can say here." She then referenced the 35 years to life sentence for the offenses, with parole eligibility after 35 years. She concluded her brief remarks, totaling only a little more than 100 words, by asking the court "to sentence [Petitioner] to concurrent time rather than consecutive." (ECF No. 17-10 at 9-10.)

40.     Emm-Smith's representation for the sentencing itself also fell below then prevailing professional norms in Nevada, including, singly and in combination: (a) her failure to help prepare her client for the presentence interview with parole and probation and to be present for the interview to assist her client, particularly when she knew that her client at the very least was "slow;" and (b) her failure, from the outset of the case through the sentencing, to develop and present mitigating evidence as opposed to leaving it to the intellectually challenged defendant to attempt to present potentially mitigating points without supporting independent corroboration and elaboration, essentially as if he were representing himself in that regard. (ECF No. 123 at 114-20, 140-42, 149-50; Petitioner's Ex. No. 15 at 3-4, 7-8, 10.)

41.     Emm-Smith did not confer to any significant degree with Petitioner regarding available appellate remedies, and she did not ask him whether he wanted to appeal. Per her testimony, she at most said nothing more to Petitioner than what she said to any of her criminal defense clients. Emm-Smith's testimony did not reflect that she approached any such discussion with Petitioner any differently even after learning from the PSI how extensive Petitioner's cognitive impairments were. At best, all that Emm-

Smith would have said to Petitioner per her standard practice was that he had 30 days to appeal, and if he wanted to appeal, "to let me know, and we would file that Notice of Appeal." (ECF No. 123 at 42-43, 47-48, 57-59, 73-76.) Emm-Smith did not even wait thereafter to see if Petitioner wanted to appeal as she withdrew from Petitioner's case on July 10, 2012—only seven days after the entry of the judgment of conviction and well before the time to appeal expired. (ECF Nos. 17-9, 17-11.) Less than 60 days after the entry of the judgment of conviction, on August 28, 2012, the intellectually challenged Petitioner reflected his desire to challenge the conviction in some manner by dispatching a form motion for appointment of state postconviction counsel. (ECF No. 17-12.) While any direct appeal would have been substantially hamstrung by Emm-Smith's prior deficient performance, there nonetheless were potential direct appeal issues raised on the face of the entire record as to whether Petitioner understood the consequences of the plea, and whether the court should have ordered a mental evaluation on that issue. Emm-Smith, however, at best made nothing more than a cursory reference to the 30-day time period for appealing without otherwise consulting with her intellectually challenged client regarding appellate remedies.

42.    After Petitioner filed a *pro se* state petition in early January 2013, the state court appointed Martin Crowley to represent Petitioner.[7] Crowley did absolutely nothing to develop the case. He did not file anything, including any counseled supplemental petition or a reply to the State's response to the *pro se* petition. He did not take any telephone calls from Petitioner. He did not meet with Petitioner at the prison to discuss his case. Crowley did not respond to Petitioner's correspondence other than an early letter. Crowley apparently ignored Petitioner's request for help in getting a client rights advocate for "retarded citizens," which further put Crowley on notice that Petitioner was

---

[7]The state district court had appointed another lawyer, John Schlegelmilch, to represent Petitioner following Petitioner's motion for an appointment of counsel dated August 28, 2012. It does not appear that Schlegelmilch took any action relevant to this case. The district court granted Petitioner's form motion to withdraw Schlegelmilch as counsel on December 3, 2012, which was prior to Petitioner's filing of a *pro se* petition. (ECF Nos. 17-12–17-15.)

intellectually challenged. Petitioner, meanwhile, could take no substantial action to pursue his case because Crowley was counsel of record. Crowley testified at the Evidentiary Hearing that he had no recollection of the case, and that he did not seek to advance any purported strategic reason for not taking any action whatsoever to represent the intellectually challenged Petitioner. A few months after Petitioner's original *pro se* filing, the state district court dismissed the petition with no action having been taken by Crowley to represent Petitioner. (ECF Nos. 123 at 79-83; 17-16–17-21; Petitioner's Ex. Nos. 2–9.)

43.     Crowley's failure to actually represent Petitioner in the state postconviction proceedings and his abandonment of Petitioner, fell below then prevailing professional norms in Nevada. (ECF No. 123 at 121-25; Petitioner's Ex. No. 15 at 4, 9, 10.)

44.     As discussed in more depth in the conclusions of law *infra*, Petitioner sustained prejudice as a result of Crowley's nonperformance as postconviction counsel and his complete abandonment of Petitioner. There was a reasonable probability of a different outcome on state postconviction review had Crowley not been derelict in his duty.

45.     Petitioner filed a *pro se* notice of appeal after the state court denied his petition. He submitted a motion for appointment of counsel that was stamped as received but was not filed by the state supreme court clerk. The state's high court affirmed the district court's denial of relief a few months later, stating generically that the high court had reviewed all proper person documents submitted to the clerk and had concluded that no relief based on the submissions was warranted. (ECF Nos. 17-22–17-25.)

46.     Finally, this Court is not persuaded on the evidence presented that there is a reasonable probability that Petitioner did not understand at the time of the charged incidents that the child was not capable of consenting to sexual activity. On this point, the Court finds Dr. Piasecki's opinion testimony along with the underlying *indicia* upon which Dr. Piasecki relies to be more persuasive. (ECF No. 124 at 10-22; Respondents' Ex. No. 12 at 7-8.)

///

## II.    CONCLUSIONS OF LAW

1.    The Court has jurisdiction under 28 U.S.C. § 2254(a).

2.    As a threshold matter, the Court proceeded consistent with the proper role of the federal judiciary and within the proper ambit of its discretion when it directed further briefing from the parties on certain issues, heard oral argument, and then granted Petitioner leave to file a second amended petition.

Respondents argued that the Court violated the party presentation principle by doing so, relying on the recent decision in *United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020). Respondents maintain that the Court should rule instead on Petitioner's first-amended petition and disregard the second amended petition. (ECF No. 116 at 19-21.)

*Sineneng-Smith* was decided on May 7, 2020, nearly two years after this Court's supplemental briefing and oral argument order. (ECF No. 56.) Moreover, the party presentation principle applied in that decision, however, is not new. *See, e.g., Wood v. Milyard*, 566 U.S. 463, 472-73 (2012). Respondents therefore could have presented the argument based on the party presentation principle well over two years ago at the time of the Court's briefing order. Respondents did not do so.

Respondents never presented arguments invoking the party presentation principle until the just-cited prehearing brief, which was a week before the Evidentiary Hearing. Respondents state that they "reiterate their position that Petitioner should not have been permitted to file a second amended petition under the circumstances." (ECF No. 116 at 19.) Yet, Respondents' prior responses instead were grounded in standard defenses to the claims in Petitioner's pleading such as exhaustion and untimeliness. (*See* ECF Nos. 60, 75, 81, 88, 91, 95.) Indeed, at oral argument now over two years ago, Respondents' counsel raised no objection to the Court's inquiry based upon the party presentation principle or otherwise.

In all events, the Court has proceeded in accord with the proper function of the federal judiciary, including with regard to the principle of party presentation as recently applied again in *Sineneng-Smith.*

21

Justice Ginsburg's unanimous opinion in *Sineneng-Smith* reaffirmed that "[t]he party presentation principle is supple, not ironclad . . . [and] [t]here are no doubt circumstances in which a modest initiating role for a court is appropriate." 140 S. Ct. at 1579. A federal court thus "is not hidebound by the precise arguments of counsel." *Id.* at 1581. The application of the party presentation principle to a given case accordingly is committed to the sound discretion of the court, subject to review for abuse of discretion. *See id.* at 1578. *See also United States v. McReynolds*, 964 F.3d 555, 566-70 (6th Cir. 2020); *Thompson v. Runnels*, 705 F.3d 1089, 1097-100 (9th Cir. 2013).

In *Sineneng-Smith*, the Supreme Court of the United States held that the appellate court abused its discretion on the facts presented in that case. As backdrop, Sineneng-Smith was a defendant in a federal criminal case where, the specific federal statutory violations aside, the government alleged that Sineneng-Smith ran a meritless immigration application scam where "she collected more than $3.3 million from her unwitting clients." 140 S. Ct. at 1578. She received concurrent sentences with no sentence of incarceration being longer than 18 months. *See United States v. Sineneng-Smith*, 910 F.3d 461, 468 n.2 (9th Cir. 2018) (the reversed appellate panel decision). Sineneng-Smith was represented by retained counsel. *See id.* at 466.

After the *Sineneng-Smith* appeal had been fully briefed by the parties, the Ninth Circuit Court of Appeals sought further briefing not from the parties but instead from three *amici* unilaterally invited by the panel to become involved in the case. Counsel for the parties thereafter "were assigned a secondary role" in the court-directed briefing and at oral argument. *See* 140 S. Ct. at 1578, 1580-81. The *amici* briefing issues raised by the panel included a First Amendment overbreadth issue that not only had not been raised by Sineneng-Smith in either the district court or on appeal, but indeed ran directly counter to the argument that she had raised. The panel ultimately invalidated a federal statute based on that overbreadth ground, notwithstanding prior Supreme Court admonitions that invalidation of statutes for overbreadth was "strong medicine" that was not to be "casually employed." *See id.* at 1578, 1579-80, 1581. The Supreme Court held that "the appeals

1    panel departed so drastically from the principle of party presentation as to constitute an

2    abuse of discretion," concluding that "the radical transformation of this case goes well

3    beyond the pale." *Id.* at 1578, 1582.

4          In contrast, in this case, the Court issued an order that, first, preliminarily discussed

5    several issues that had been raised by the parties. (ECF No. 56 at 1-2.) The Court

6    thereafter directed oral argument with prehearing briefing to "assist it in addressing the

7    pending amended petition" that had been filed by Petitioner. (*Id.* at 2.) The Court set forth

8    several issues that it wished for the parties to address. Those issues included the

9    evidence that would be presented and the resulting procedural issues as to the existing

10   claims if the Court were to reconsider its prior denial of Petitioner's motion for an

11   evidentiary hearing.[8] The Court further inquired in broad brush as to whether the evidence

12   to be presented by Petitioner at an evidentiary hearing would potentially support

13   additional claims and the procedural issues that might arise as to the additional claims.

14   None of the broadly referenced potential claims would, if raised, contradict any claim,

15   argument, or position previously taken by Petitioner. All of the procedural issues the Court

16   identified were typical defensive issues—such as timeliness, relation back, exhaustion

17   and procedural default—that typically are raised by the respondents in a federal habeas

18   case when a petitioner presents new evidence and/or claims later in the proceeding. (*See*

19   *id.* at 3.)[9]

20         The order explained why the Court requested oral argument and further input from

21   the parties:

---

23         [8]An interlocutory order is subject to modification, including *sua sponte*, at any time
24   prior to entry of final judgment. *See e.g., City of L.A. v. Santa Monica Baykeeper*, 254
     F.3d 882, 885-89 (9th Cir. 2001). Nothing in *Sineneng-Smith* precludes a court from
     reconsidering a prior interlocutory ruling after further review of a case. And, nothing in
25   *Sineneng-Smith* precludes a court from first seeking briefing from the parties prior to any
     such reconsideration of the prior ruling.

26         [9]In *Sineneng-Smith*, the panel permitted the invited *amici* to address any additional
27   issues that they believed were relevant while restricting the sidelined parties to
     addressing only matters raised in the *amici* briefs. 140 S. Ct. at 1581. This Court's order
28   sought input from the parties on the points noted by the Court as well as "[a]ny related
     argument by the parties." (ECF No. 56 at 3.)

> The Court wishes to ensure . . . that this matter is decided both properly and upon an adequate record given in particular, *inter alia*: the indications in the record that do reflect that Petitioner is intellectually challenged to some degree; the rapidity with which the matter proceeded to a plea agreement in only a matter of days without any professional assessment of Petitioner's competence to proceed and to fully comprehend the plea proceedings; the fact that Petitioner was sentenced following upon the plea to essentially life without parole; and the fact that Petitioner's state post-conviction counsel did literally nothing during that appointment.

(ECF No. 56 at 2 (footnote omitted).)

During the briefing and at oral argument, Petitioner requested leave to file a second amended petition. The Court subsequently granted Petitioner's motion for leave in an order addressing the issues presented on the request. (ECF No. 68.) The matter thereafter has been litigated on pleadings, claims, evidence, and argument presented by Petitioner and responding defenses presented by Respondents. (ECF Nos. 69-129.) The only issue specifically interjected by the Court in the following proceedings was on a show cause order on an affirmative defense of exhaustion, consistent with prior law as to the *sua sponte* consideration of such a defense following notice and an opportunity to be heard. (ECF Nos. 93-96.)

The Court did not go beyond the appropriate modest initiating role referenced in Justice Ginsburg's *Sineneng-Smith* opinion. *See supra* p. 22.

Here, Petitioner is not a well-heeled defendant with retained counsel but instead an indigent and intellectually challenged petitioner relying on counsel appointed by the Court. The intellectually challenged petitioner pled and was then sentenced essentially to life without parole with extreme rapidity in state criminal proceedings with no professional assessment of his ability to adequately understand the proceedings. Petitioner was then fully abandoned by state postconviction counsel. This Court clearly acted within the scope of its discretion when it inquired—of counsel for the parties—whether justice was being served in this case prior to proceeding to judgment.

The party presentation principle coexists within, not supplants, the equal administration of justice by the federal courts. The party presentation principle did not

prevent the Court from inquiring as to the justice of the case where an intellectually challenged inmate faced not 18 months but instead the rest of his life in custody, following a procedural history that should give anyone committed to the equal administration of justice cause for concern.

A federal district court most assuredly has the authority and the discretion, in an extraordinary case such as this, to ask counsel appointed by the Court, on the record rather than *ex parte*, whether justice is being served and whether all avenues for potential relief have been adequately explored.[10]

*Sineneng-Smith* thus does not support a conclusion that the party presentation principle precluded this Court from inquiring of the parties as to the justice of this case prior to entry of judgment.

---

[10]Respondents posit that "[o]nce this Court appointed counsel, it was up to counsel and [Petitioner] to decide which claims to present and how to present them." (ECF No. 116 at 20.) That of course is true, and in the final analysis that remains true in this case. The claims currently being litigated were developed, pled, and pursued by Petitioner's counsel. If, for example, counsel had represented to the Court in response to the order that based on counsel's internal investigation that the claims presented in the first amended petition were the only claims that properly could or should be pursued, the matter would have proceeded to judgment as the case then stood. Counsel instead requested leave to amend in response to the Court's queries.

However, the proposition that the Court cannot under any circumstances pose the questions it posed does not follow. The purpose of 18 U.S.C. § 3006A is to assure the competent representation of indigent litigants where, in this context, the interests of justice warrant appointment of counsel. *See, e.g., United States v. Tutino*, 419 F. Supp. 246, 248 (S.D.N.Y. 1976). Federal district courts most certainly do not supervise appointed counsel in the handling of their cases or otherwise. Nor does a court just appoint counsel and then turn a wholly blind eye and deaf ear to the justice of what transpires in the case. At the outer bound, in egregious circumstances of dereliction of duty, this Court has appointed substitute counsel under § 3006A(c) and removed attorneys from the CJA panel. *See also Huebler v. Vare*, Case No. 3:05-cv-00048-RCJ-VPC, 2014 WL 1494271, at *10-*15 (D. Nev. Apr. 15, 2014) (disagreeing with both counsel as to the presence of conflict and *sua sponte* substituting counsel for the Federal Public Defender under the Court's supervisory authority over the administration of justice). In a not egregious but nonetheless extraordinary case, a court certainly may ask questions—potentially probing questions—as to whether justice is being served in the case. Such measured inquiry from the bench, reserved to extraordinary cases, is consistent with the long-established supervisory power of the federal courts over their processes and those who appear before them, as well as with the party presentation principle.

3.     The Court's review of the issues remaining herein is *de novo*. The determination of whether Petitioner has overcome the procedural default of his claims is made *de novo*. *E.g., Ramirez v. Ryan*, 937 F.3d 1230, 1243, 1244 (9th Cir. 2019); *see also Visciotti v. Martel*, 862 F.3d 749, 768-69 (9th Cir. 2017). If Petitioner does so on a claim, the claim then is reviewed *de novo* on the merits. *E.g., Rodney v. Filson*, 916 F.3d 1254, 1258, 1262 (9th Cir. 2019); *Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017); *Dickins v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (*en banc*).[11]

4.     The Court's factual findings include findings pertinent, at least in part, respectively to each of the grounds alleged, as background to the discussion herein. The Court, however, focuses in these conclusions on Ground 4, on which it grants relief.

5.     Given the findings and conclusions herein, Petitioner has demonstrated cause and prejudice to overcome the procedural default of at least Ground 4 under both *Maples v. Thomas*, 565 U.S. 266 (2012), based upon abandonment by state postconviction counsel, and *Martinez v. Ryan*, 566 U.S. 1 (2012), based upon the functional absence of and/or ineffective assistance of state postconviction counsel. *See generally Rodney*, 916 F.3d at 1259 (full statement of background procedural default law and the *Martinez* requirements, as applied in the Nevada context).

6.     Given the findings herein, Petitioner has demonstrated cause under *Maples* based upon state postconviction counsel's abandonment of Petitioner. Counsel Martin Crowley did absolutely nothing after he was appointed. He did not file anything. He ignored Petitioner's inquiries about the case following an initial response. It is difficult to conceive of a more complete case of attorney abandonment, which clearly demonstrates cause under *Maples.*

---

[11]Petitioner's pending claims are actually unexhausted but are technically exhausted by procedural default. Petitioner is seeking to establish cause and prejudice to overcome the procedural default based upon: (a) abandonment by state postconviction counsel; and/or (b) ineffective assistance of state postconviction counsel. The first potential basis is not available in the Nevada state courts on the record presented, and the second categorically is not available in state court. Petitioner thus has not had occasion to seek a stay to return to state court for exhaustion. (*See* ECF No. 96 at 1-5.)

7.     Petitioner further sustained the requisite prejudice to overcome the procedural default of at least Ground 4 based upon abandonment under *Maples*.

First, the Court holds that the showing of prejudice required to overcome a procedural default under *Maples* is satisfied regarding claims of ineffective assistance of trial counsel if the standard for prejudice as to such claims under *Martinez* is satisfied. Given the Court's holding *infra* that the *Martinez* standard is satisfied as to Ground 4, prejudice also is established vis-à-vis cause under *Maples* as to this claim.[12]

Second, the Court holds that the requisite standard of prejudice as to at least Ground 4 is satisfied given the Court's holding *infra* that the claim is meritorious.

8.     As elaborated further *infra*, Petitioner has demonstrated both cause and prejudice under *Martinez* to overcome the procedural default of the claim of ineffective assistance of trial counsel in at least Ground 4, based upon the functional absence of and/or ineffective assistance of state postconviction counsel.

In the Nevada context, to demonstrate "cause" under *Martinez* in cases where state postconviction counsel was appointed, the petitioner must show that postconviction counsel was ineffective under the standard in *Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner must show: (a) postconviction counsel provided deficient performance in failing to present the claim of ineffective assistance of trial counsel; and (b) there was

///

///

---

[12]The relationship between the "actual prejudice" standard required generally under procedural default doctrine and the specific *Martinez* prejudice standard has been a matter of discussion. *See, e.g., Rodney*, 916 F.3d at 1260 n.2; *Atwood*, 870 F.3d at 1059 n.21; *Runningeagle v. Ryan*, 825 F.3d 970, 982 n.13 (9th Cir. 2016); *see also Smith v. Baker*, 983 F.3d 383, 395 (9th Cir. 2020) (referring to the general "actual prejudice" standard and the *Martinez* standard without any explicit distinction). In the final analysis, however, it would be anomalous if a petitioner completely abandoned by postconviction counsel and thus received essentially no representation was required to satisfy a more onerous prejudice standard on this type of claim than was required under *Martinez*. Given the ultimate outcome herein on the claim, the Court does not tarry further over the matter of any possible distinction between the general and specific prejudice standards in this context.

1  a reasonable probability that the result of the postconviction proceeding would have been

2  different if counsel instead had raised the claim. *E.g., Ramirez*, 937 F.3d at 1241.[13]

3      To demonstrate "prejudice" under *Martinez*, a petitioner must show the defaulted

4  claim of ineffective assistance of trial counsel is a "substantial" claim. A claim is

5  "substantial" for purposes of *Martinez* if it has "some merit," which refers to a claim that

6  would warrant issuance of a certificate of appealability ("COA"). *Id.* In pertinent part, a

7  claim would warrant the issuance of a COA, thus "substantial" for purposes of *Martinez*,

8  if reasonable jurists could debate the proper disposition of the claim or the issue

9  presented is adequate to deserve encouragement to proceed further. This standard does

10  not require a showing that the claim will succeed, but instead only that its proper

11  disposition could be debated among reasonable jurists. *Id. See generally Miller-El v.*

12  *Cockrell*, 537 U.S. 322, 336-38 (2003) (articulating the COA standard).

13      There is substantial overlap between these criteria for both cause and prejudice

14  under *Martinez* because they all ultimately turn upon the strength or weakness of the

15  underlying claim of ineffective assistance of trial counsel. *See Ramirez*, 937 F.3d at 1241-

16  42; *Atwood*, 870 F.3d at 1059-60.

17      9.    Petitioner has clearly demonstrated that Martin Crowley was deficient in

18  failing to raise at least Ground 4 in the state postconviction proceedings. The Court's

19

20      [13]*Martinez* additionally requires: (a) the state court proceeding be an initial-review
collateral proceeding for purposes of that decision; and (b) state procedural law
21  sufficiently requires an inmate to present a claim of ineffective assistance of trial counsel
for the first time in that proceeding. *E.g., Smith*, 960 F.3d at 533-34. Neither threshold
22  requirement is at issue in this case arising from Nevada.

23      Cause is demonstrated under *Martinez* also by the absence of state postconviction
counsel, and the *Strickland*-based cause analysis outlined in the text then does not apply.
24  *E.g., id.* at 533. The text herein assumes for purposes of discussion that this alternative
basis for cause under *Martinez* is not applicable in this case because the state court
25  appointed postconviction counsel. However, postconviction counsel's complete
abandonment of Petitioner put Petitioner in an even worse position than a *pro se* litigant
26  because the intellectually challenged Petitioner then was precluded by the appointment
from taking any steps himself to pursue his case. It is thus arguable that cause should be
27  found for purposes of *Martinez* on this basis alone, without additionally conducting a
*Strickland* analysis of postconviction counsel's (completely nonexistent) performance.
28

1   discussion *infra* establishes this ground meritorious, and it was a deficient performance
2   to not investigate, develop, and then present this Ground at the very least.[14]

3       Any bare presumption under *Strickland* that Crowley's failure to raise the claims
4   resulted from a strategic decision has readily been overcome in this case. (ECF No. 116
5   at 4.) Nothing in Crowley's testimony, or the remaining record, reflects that he took any
6   action at all in the case, including any investigation, based on a strategic decision rather
7   than complete dereliction of duty. Nor has any purported strategic rationale for that
8   complete dereliction of duty been postulated. In any event, any such *post hoc* rationale
9   would fly in the face of the available record and thus would not provide a basis for denying
10  relief under the *Strickland* standard. *See, e.g., White v. Ryan*, 895 F.3d 641, 666-67 (9th
11  Cir. 2018). The record instead reflects abject dereliction of duty. Moreover, the *Strickland*
12  standard defers to strategic choices that are made only after counsel has conducted a
13  reasonable investigation or has made a reasonable decision that makes further
14  investigation unnecessary. *E.g., Smith v. Baker*, 983 F.3d 383, 396-97 (9th Cir. 2020).
15  The record abundantly reflects that no such investigation or decision-making occurred—
16  and here, even a minimal review would have given cause for further investigation—and
17  in fact, the record reflects complete inaction by counsel.

18      Indeed, merely because a state postconviction counsel may have raised *some*
19  claims of ineffective assistance of trial counsel does not preclude a petitioner from
20  demonstrating ineffective assistance of postconviction counsel. *See Detrich v. Ryan*, 740
21  F.3d 1237, 1248 (9th Cir. 2013) (*en banc* plurality). Here, Crowley raised *no such claims*
22  *whatsoever*, despite the existence of at least one meritorious claim that would have been

23

24      [14]In its internal analysis, the Court has considered procedural default and merits
25  issues in the appropriate order reflected herein, *i.e.* first considering whether Petitioner
    has overcome the procedural default of a claim before proceeding to the merits. It is
26  clearer and more direct to discuss all factual and legal points pertaining only to the merits
    in the discussion of the merits and to cross-reference the merits discussion as it relates
27  back to the procedural default analysis. This portion of the order thus discusses points
    specific only to the procedural default analysis while cross-referencing the later merits
28  discussion, where the strength of the underlying ineffective-assistance claim bears on the
    procedural default analysis.

apparent with appropriate investigation. *Cf. id.* ("Nothing in *Martinez* suggests that a finding of 'cause' excuses procedural default *only when* state PCR counsel raised no claims of trial-counsel IAC whatsoever.") (emphasis added).

Clearly, a record establishing that postconviction counsel failed to do anything at all—conducting no investigation, presenting no claims, and filing nothing whatsoever—despite the existence of not only a potentially viable but in fact a meritorious claim fully negates any applicable presumption under *Strickland.* Any such presumption does not countenance a lawyer doing absolutely nothing for a petitioner, particularly where there is a meritorious claim that could have been pursued. Any such presumption further does not countenance a reviewing court ignoring the complete dereliction of duty by Crowley in this case. Accordingly, Petitioner has conclusively demonstrated deficient performance by Crowley in failing to raise, at the very least, Ground 4.

10.    Petitioner has further demonstrated resulting prejudice under the *Strickland* standard from Martin Crowley's deficient performance in failing to raise at least Ground 4. Given the Court's discussion of the merits *infra*, there clearly is a reasonable probability the outcome of the state postconviction proceedings would have been different had postconviction counsel raised the claim.

11.    Petitioner has accordingly demonstrated cause under *Martinez* as to at least Ground 4.

12.    Petitioner has further demonstrated prejudice under *Martinez* in that Ground 4 is a "substantial claim." Given the discussion of the merits *infra*, the claim is meritorious and thus clearly would satisfy the COA threshold standard for a substantial claim under *Martinez*.

13.    Petitioner has thus overcome the procedural default of at least Ground 4.

14.    The Court now turns to the merits of Ground 4. Emm-Smith rendered ineffective assistance of counsel when she failed to investigate Petitioner's intellectual disability and mental status. This led to Petitioner entering a plea that was not knowing and voluntary, in violation of the Sixth and Fourteenth Amendments.

On the merits of this claim, the *Strickland* analysis now focuses directly on the performance of defense counsel in the original criminal proceeding and on the impact of counsel's performance on that proceeding. Accordingly, Petitioner must demonstrate, on what is *de novo* review herein, that: (1) defense counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the performance prong, the objective measure of counsel's performance is determined by looking at the reasonableness of counsel's actions and inactions under then prevailing professional norms. The issue is not what counsel might have done differently but rather whether counsel's decisions were reasonable from counsel's perspective at the time. The reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Smith*, 983 F.3d at 396-99; *Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

15.    As the foregoing factual findings reflect, Emm-Smith's performance fell below an objective standard of reasonableness in that her failure to investigate Petitioner's intellectual disability and mental status, with respect to Petitioner's ability to understand the proceedings without counsel's use of additional methodologies, did not satisfy then prevailing professional norms in Nevada.

Respondents argue that Emm-Smith made a strategic decision to proceed to plead her client with alacrity because (a) the prosecutor in question likely would greatly expand the charges if Petitioner did not enter a plea before the preliminary hearing, and (b) Emm-Smith believed she had obtained the best plea deal she could from the prosecutor because he would not go below two counts.[15] (*See* ECF No. 123 at 49-52, 61-62.) Yet, in all events, Petitioner's plea still had to be knowing and voluntary. Emm-Smith failed to

---

[15]Even this premise is questionable given that the plea deal before the particular judge would result in essentially a life sentence for a then 30-year-old defendant (consisting of two consecutive 35 years) as discussed further *infra*.

conduct the basic investigation generally called for by then prevailing professional norms and that would have revealed the severity of Petitioner's intellectual disability. Emm-Smith further ignored the *indicia* she was aware of that reinforced the need to investigate Petitioner's intellectual disability and mental status in the specific case before her. She nonetheless proceeded to plead her knowingly "slow" client despite her not thinking that he ever "truly comprehended that he could go away for, for a – to prison for a long time." A purportedly strategic decision to proceed with such alacrity was made without adequate investigation—and notwithstanding counsel's acknowledged belief that her client did not understand the most fundamental consequence of the plea—warrants no deference under *Strickland. See, e.g., Smith*, 983 F.3d at 396-97.

Moreover, Emm-Smith obtained essentially nothing in exchange for rushing her intellectually challenged client into a plea that he clearly did not understand. On the seven pre-plea charges, Petitioner faced an aggregate minimum sentence with consecutive sentencing of 185 to 200 years. Under the plea deal, the 30-year-old intellectually challenged Petitioner, who was at the time a defendant, was exposed to an aggregate minimum sentence with consecutive sentencing of 70 years, in a circumstance where it was probable the court would impose consecutive sentences. Again, in all events, Petitioner's plea must be knowing and voluntary. But pleading a defendant to a sentence of essentially life without parole to "avoid" a sentence also of essentially life without parole most certainly does not justify proceeding with such disregard for whether the intellectually challenged defendant reliably understood the consequences of the plea proceedings, which he clearly did not.[16]

---

[16]As to the prospect of the prosecutor adding charges, it is worth noting that if the prosecutor doubled Petitioner's potential minimum sentencing exposure with consecutive sentencing from 185 to 200 years instead to 370 to 400 years, that as a practical matter is still a sentence of life without parole. A plea to a probable 70 years to avoid such a prospect did not materially change Petitioner's exposure, whether in relation to the pre-plea charges or any added charges.

The Court further notes, with respect to the prosecutor allegedly not willing to go below two counts, that not all seven counts carried a minimum 35 years. Alleged offenses

Counsel who fails to conduct any investigation of her "slow" client's intellectual disability and mental status—and who then rushes to plead her client while believing that he does not understand the most fundamental consequence of the plea, that he was going to prison likely for the rest of his life—fails in her role as the counsel required under the Sixth Amendment. Emm-Smith's failure to conduct any investigation of Petitioner's intellectual disability and mental status heading into the plea, unquestionably constituted deficient performance.

16.     As the foregoing factual findings further reflect, Petitioner sustained resulting prejudice because there was a reasonable probability at the time of the plea, Petitioner did not understand the plea decision and the consequences of the plea.

Relying on *Hill v. Lockhart*, 474 U.S. 52 (1985), Respondents contend that to show the requisite prejudice Petitioner must show instead that with proper representation he would have insisted on going to trial. (ECF No. 116 at 3-4,16; *cf.* ECF No. 128 at 12-13, 16, 18-19.) In a context where improper counsel advice led to entry of a plea, *Hill* held that a defendant must show "a reasonable probability that, but for counsel's errors, he [or she] would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.[17]

---

occurring prior to October 1, 2007, carried instead a minimum 20 years. *See supra* Finding No. 5 at pp. 4-5.

[17]Respondents additionally contend that because Ground 4 is an ineffective assistance claim, "the relevant question is now not whether the plea was invalid, but whether counsel's advice to plead guilty was objectively unreasonable." Respondents maintain that "[t]he answer to this question . . . turns upon whether a reasonable attorney who investigated [Petitioner's] mental status would have advised him to plead guilty, *even if it turned out that the plea itself was invalid.*" (ECF No. 128 at 12 (emphasis added).) In the same vein, Respondents posit further that because Ground 4 is premised upon a failure to investigate, *Hill* hinges the prejudice determination on whether the result of the investigation "would have led counsel to change his recommendation as to the plea.'" (*Id.* at 18 (quoting *Hill*, 474 U.S. at 59).) Respondents misread *Hill*. The Supreme Court was speaking in the latter quoted material to counsel's failure specifically "to investigate or discover potentially exculpatory evidence," which is an entirely distinct situation from a failure to investigate defendant's mental status vis-à-vis their understanding of a plea deal. *Id. Hill* does not support the notion that the Sixth Amendment contemplates that counsel representing a "slow" defendant can simply proceed without regard to whether their client understands a plea deal so long as counsel would have recommended it.

33

As the Supreme Court of the United States explained in *Missouri v. Frye*, 566 U.S. 134 (2012), "*Hill* does not, however, provide the sole means for demonstrating prejudice arising from the deficient performance during plea negotiations." *Id.* at 148. As the Court further elaborated in *Lafler v. Cooper*, 566 U.S. 156 (2012), the same day, "*Strickland* recognized '[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [or other proceeding] cannot be relied on as having produced a just result.'" *Id.* at 168-69 (brackets added) (quoting *Strickland*, 466 U.S. at 686). *See also Rodriguez-Penton v. United States*, 905 F.3d 481, 487-89 (6th Cir. 2018) (stating that *Frye* clarifies that prejudice may be established without showing the defendant necessarily would have gone to trial, and that prejudice potentially may lie where petitioner demonstrates counsel's deficient performance undermined confidence in the outcome of plea process).

In *Hill*, counsel erroneously advised a defendant with no documented cognitive impairments regarding the minimum time defendant must serve before parole eligibility, underestimating the minimum time by just under six years, with the Supreme Court noting such information was not required for a plea to be voluntary. *See* 474 U.S. at 53-56. Here, in contrast, Emm-Smith failed to take necessary steps so that her intellectually challenged client understood the most fundamental and central consequence of the plea—that he was going to prison most likely for life. The situation is not that a defendant made a plea decision after receiving inaccurate collateral information. Rather, the situation is that the intellectually challenged defendant did not even understand the plea decision he ostensibly was making, including the most fundamental consequence of that decision.

Even with the minimal information and interaction Emm-Smith had, she did not think "that he truly comprehended that he could go away, for a – to prison for a long time." If an intellectually challenged defendant does not have that understanding when entering a plea to likely life imprisonment, that presents a situation different in kind and not merely in degree from *Hill.* That situation, as with this case, instead presents the sort of "extreme ///

34

malfunction"[18] that federal habeas, including *Strickland*, properly seeks to correct. Where an intellectually challenged defendant does not understand even the most fundamental consequence of the plea decision, which goes to the core of voluntariness under *Boykin v. Alabama*, 395 U.S. 238 (1969), it makes no sense to assess whether defendant would have made a different decision when defendant clearly did not understand the decision he or she purportedly made. In this situation, which is markedly distinct from *Hill*, the prejudice found by the Court herein suffices for relief under the Sixth Amendment.[19]

17.    Petitioner is thus entitled to habeas relief on Ground 4.[20]

18.    The Court therefore need not reach Grounds 2, 3, and 5, as Petitioner clearly would be entitled to no greater relief on any of these grounds if meritorious.[21]

---

[18]*See Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[19]*See Griffin v. Johnson*, 350 F.3d 956, 960 (9th Cir. 2003) (considering procedural default issues as to an IAC claim based on counsel failing to investigate defendant's mental health history and allowing defendant to enter a plea not knowing and voluntary due to defendant's alleged incompetence); *Sherwood v. Sherman*, 734 F. App'x 471 (9th Cir. 2018) (considering comparable claim); *see also Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990).

An unimpaired defendant who instead did understand the plea offer readily could have rejected it. Again, in context, the offer involved pleading to a probable functionally sentence of life without parole to "avoid" a potential functionally sentence of life without parole. Even if the plea offer avoided an additional 130 years or more of exposure, that would make little practical difference to a defendant that most likely would have no chance of a parole outside of prison walls before reaching 100 years after taking the plea deal. A rational defendant who understood the plea offer thus easily could reject the offer on the premise that defendant had nothing of substance to gain from the plea, and correspondingly nothing of substance to lose by instead going to trial. However, defendant *first* must *understand* the most fundamental consequence of the plea decision before such calculus comes into play. The intellectually challenged Petitioner clearly did not, due to counsel's deficient performance throughout the exceedingly brief representation.

[20]Respondents perhaps maintain, well after the Evidentiary Hearing, that Petitioner's evidence at the hearing went beyond his claims as alleged in the second amended petition. (ECF No. 128 at 2, 12 n.3.) To the extent that was the case, Respondents failed to object to any evidence on that basis at the Evidentiary Hearing. The pleadings thus are amended by implied consent pursuant to Rule 15(b) of the Federal Rules of Civil Procedure. *See, e.g., Banks v. Dretke*, 540 U.S. 668, 703-05 (2004).

[21]The plea and conviction will be set aside on the meritorious Ground 4, subject to further proceedings toward a trial or other resolution of the criminal case. In comparison,

1    These grounds will be denied without prejudice and as moot following the grant of relief
2    on Ground 4.

3          19.    In contrast, Ground 1 will be denied with prejudice as procedurally defaulted
4    and alternatively on the merits, based on the Court's final factual finding. The Court thus
5    has no occasion to consider the extent of relief on an instead meritorious Ground 1.

6          20.    Turning to the remedy in this matter, the Court concludes the appropriate
7    remedy would be to grant a conditional writ of habeas corpus vacating the plea and
8    conviction, together with the waiver of a preliminary hearing that was effected incident
9    with the plea deal, subject to the State's ability to try Petitioner or pursue the state criminal
10   case otherwise through to a conclusion.

11         The writ of habeas corpus is "at its core, an equitable remedy." *Schlup v. Delo*, 513
12   U.S. 298, 319 (1995). Accordingly, "[t]he very nature of the writ demands that it be
13   administered with the initiative and flexibility essential to insure that miscarriages of justice
14   within its reach are surfaced and corrected." *Harris v. Nelson*, 394 U.S. 286, 291 (1969).
15   This flexible and equitable nature of habeas corpus relief is carried forward in 28 U.S.C.
16   § 2243, which authorizes federal courts to resolve habeas matters as law and justice
17   require. *See Hilton v. Braunskill*, 481 U.S. 770, 775 (1987). This statutory authority "vests
18   a federal court 'with the largest power to control and direct the form of judgment to be
19   entered in cases brought up before it on *habeas corpus*.'" *Id.* (emphasis in original)
20   (quoting *In re Bonner*, 151 U.S. 242, 261 (1894)). *See also Sanders v. Ratelle*, 21 F.3d
21   1446, 1461 (9th Cir. 1994).

22         Federal courts thus have broad authority in conditioning a judgment granting relief.
23   *See Braunskill*, 481 U.S. at 775; *Nunes v. Mueller*, 350 F.3d 1045, 1057 (9th Cir. 2003).
24   A federal district court has broad discretion, within the context of the unique facts and
25   circumstances of the particular case, to fashion a remedy tailored to the injury suffered
26   from the constitutional violation. *See Nunes*, 350 F.3d at 1056-57. Where a defendant

27
28   the relief on Ground 3 would be resentencing and on Ground 5 would be an out-of-time
     direct appeal, without otherwise undermining the plea and underlying conviction.
     Petitioner would be entitled to no greater relief on Ground 2 than Ground 4.

36

has been denied effective assistance of counsel in particular, the remedy "'should put the defendant back in the position he [or she] would have been if the Sixth Amendment violation never occurred,'" but "without 'unnecessarily infringing on competing interests.'" *Id.* at 1057 (quoting prior circuit and Supreme Court authority, respectively).[22]

The appropriate remedy in the present case, via the conditional writ, is to return Petitioner fully to the *status quo ante*: the waiver of a preliminary hearing pursuant to the agreement to the plea deal, subject to the State's ability to try Petitioner or pursue the state criminal case otherwise through to a conclusion. The Court finds that the interests of justice are best served, and habeas relief is most complete, by providing for a return of the state court proceedings to the point prior to when Petitioner waived a preliminary hearing as part of the plea negotiations and deal.

21.   If any of the findings of fact herein instead should be considered a conclusion of law, or vice versa, it is the Court's intention that it be so considered.

## III.   CONCLUSION

It is therefore ordered that the petition for a writ of habeas corpus, as amended, is conditionally granted on Ground 4 and the state court judgment of conviction of Petitioner James David McClain in Case No. 37877 in the Tenth Judicial District Court for the State of Nevada, hereby is vacated, along with the guilty plea and waiver of a preliminary hearing entered therein, and Petitioner will be released from custody within 30 days of the later of the conclusion of any proceedings seeking appellate or *certiorari* review of the Court's judgment, if affirmed, or the expiration of the delays for seeking such appeal or review, unless the State files a written election in this matter within the 30-day period to try Petitioner and thereafter commences jury selection in the trial, or otherwise pursues the criminal matter through to a conclusion in the state district court without trial, within 120 days following the election to try Petitioner, subject to reasonable request for modification of the time periods in the judgment by any party pursuant to Rules 59 or 60.

---

[22]Competing interests include not granting a windfall to defendant or needlessly squandering resources that a state properly has invested in a criminal prosecution. *See Lafler*, 566 U.S. at 170.

Grounds 2, 3, and 5 are denied without prejudice and as moot following upon the conditional grant of the writ on Ground 4; and Ground 1 is denied with prejudice as procedurally defaulted and in the alternative on the merits.

The Clerk of Court is directed to enter final judgment accordingly, conditionally granting the petition for a writ of habeas corpus as provided in the above paragraph verbatim and close this case.

The Clerk of Court is further directed to substitute Perry Russell for Robert LeGrand as Respondent.

The Clerk of Court is further directed to provide a copy of this order and the judgment to the Clerk of the Tenth Judicial District Court, in connection with that court's Case No. 37877.

DATED THIS 18th Day of March 2021.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE